**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                **Criminal Case No.: 2:21-CR-31
(JUDGE KLEEH)**

**JOSEPH WAYNE DADISMAN,**

        **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT
DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 26] BE DENIED**

Presently pending before the undersigned Magistrate Judge is Defendant's Motion to Suppress Physical Evidence, [ECF No. 26], filed on January 14, 2022. By Order entered the same day, January 14, 2022, [ECF No. 27], United States District Judge Thomas S. Kleeh referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The undersigned also is in receipt of the Government's Response to the Defendant's Motion to Suppress Evidence, filed on January 19, 2022. [ECF No. 29]. The undersigned conducted a hearing on Defendant's motion on February 3, 2022, at which the Court heard witness testimony and accepted exhibits into evidence. The parties, with leave of the Court, filed supplemental briefs after said hearing. [ECF Nos. 40 and 42].

Based on a detailed review of Defendant's motion, [ECF No. 26], the Government's response, [ECF No. 29], the parties supplemental briefs, [ECF Nos. 40 and 42], the exhibits introduced into evidence at the hearing on Defendant's motion, and the testimony given by witnesses at said hearing, the undersigned **RECOMMENDS** that Defendant's motion, [ECF No. 26], be **DENIED** as set forth herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Joseph Wayne Dadisman ("Defendant") stands accused in a one-count indictment which a Grand Jury returned against him on October 19, 2021. [ECF No. 1]. Defendant is named in the Indictment with the offense of Possession with Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

On June 29, 2021, Defendant Dadisman left his residence and began driving his motorcycle down Union Road in Philippi, West Virginia. Sherriff Brett M. Carpenter of the Barbour County Sheriff's Department observed Dadisman. Sherriff Carpenter and Deputy Sheriff Shahan were speaking on the cellphone at the time as they patrolled Union Rd. in their respective police vehicles. Sheriff Carpenter informed Deputy Shahan that Dadisman was a "big player" in methamphetamine sales in Barbour County.

Sheriff Carpenter began to follow Dadisman who eventually entered the Shop and Save parking lot. Another deputy ran the license plate on the motorcycle and informed Sheriff Carpenter that Dadisman had an improper license plate on his vehicle. Dadisman left the Shop and Save parking lot and began traveling on South Main Street. Dadisman pulled off the road and into the Rich Oil Co. gas station. Sheriff Carpenter initiated the emergency lights on his vehicle and followed Defendant's motorcycle into the gas station lot in order to conduct a traffic stop on Defendant based upon the improper vehicle registration.

As Defendant dismounted his motorcycle, he noticed Sheriff Carpenter, removed his helmet, and approached Sheriff Carpenter. Sheriff Carpenter conducted a pat down search on Dadisman and then began to question Dadisman. Chief Deputy Jeff Roy arrived on scene. Dadisman advised Sheriff Carpenter that he had a legal firearm in a saddle bag on the motorcycle.

2

Sheriff Carpenter began searching the motorcycle for the firearm. When he had difficulties finding the firearm, Dadisman assisted in locating and removing the firearm from the bag for Sheriff Carpenter. Sheriff Carpenter secured the firearm by placing it into his own police vehicle.

Other deputies from the Barbour County Sheriff's Department, including Deputy Shahan, soon also arrived on scene. Dadisman engaged in conversation with Chief Deputy Roy and Sheriff Carpenter at this time. Sheriff Carpenter asked Dadisman if he had any other weapons or methamphetamine in his possession which he denied.[1] Dadisman explained to officers that he was on his way to visit family and expressed concerns about being late to see them.

Several minutes later, K-9 Handler Lt. Cale and his trained canine Raptor arrived on the scene. Chief Walters of the Philippi Police Department dispatched Lt. Cale to the scene after hearing about the Dadisman traffic stop on the radio. Raptor performed an open-air sniff on the motorcycle and alerted on the rear saddlebag of the vehicle to the presence of controlled substances. At this time, Dadisman admitted to having "a little bit of meth" in his possession.[2] At the direction of deputies, Dadisman then walks over to his motorcycle, pulls out a bag of methamphetamine,[3] and hands it to Sheriff Carpenter. [1:53:07-1:53:28]. Dadisman is placed into handcuffs and arrested based upon the discovery of the methamphetamine.

---

[1] There is contradictory testimony as to whether Dadisman admitted to having "a little bit of meth" before or after the open-air sniff by the trained narcotics dog and as to whether Dadisman provided consent at any time for the deputies to search the motorcycle.

[2] *See supra* n.1.

[3] There is a discrepancy regarding the actual weight of methamphetamine recovered from the vehicle. The affidavit for the search warrant drafted by Deputy Shahan references "an approximate pound of suspected methamphetamine." [ECF No. 37-1 at 14]. The criminal complaint, also drafted by Deputy Shahan, states that the substance weighed "1.142 pounds." [ECF No. 37-2 at 2]. However, the testimony of Deputy Shahan, detailed herein, was that approximately two and a half pounds of methamphetamine were recovered.

Based upon the discovery of the methamphetamine, on the same day, June 29, 2021, a search warrant was sought and obtained by deputies for a search of Dadisman's residence. More methamphetamine and firearms were seized during the search of Defendant Dadisman's residence.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on February 3, 2022, the Court heard sworn testimony from five witnesses, namely: (1) Barbour County Deputy Sheriff Samuel W. Shahan; (2) Barbour County Sheriff Brett M. Carpenter; (3) Lieutenant D.A. Cale, Canine Handler for the Philippi Police Department; (4) Barbour County Chief Deputy Sheriff J.D. Roy; and (5) Defendant Joseph Wayne Dadisman.

The Court also received the following exhibits into evidence: Government's Exhibit 1,[4] CD-ROM containing footage from the dashboard camera of Sherriff Carpenter's vehicle; Government's Exhibit 2, [ECF No. 37-1], June 29, 2021 Search Warrant for the Dadisman Residence Property; and Government's Exhibit 3, [ECF No. 37-2], June 29, 2021 Criminal Complaint.[5]

### (1) Deputy Sheriff Samuel W. Shahan's Testimony

According to the testimony[6] of Deputy Sheriff Samuel W. Shahan ("Shahan" or "Deputy Shahan") of the Barbour County Sheriff's Department, Shahan is assigned to work on the Mountain Region Drug Task Force in Elkins, West Virginia [1:08:12-1:08:32]. On June 29, 2021, Deputy Shahan was following behind the cruiser vehicle of Sheriff Brett M. Carpenter in his

---

[4] A copy of Government's Exhibit 1 was provided to the Clerk's Office on a CD to be archived in the case file. A copy was also provided to the undersigned's chambers for review prior to the motion hearing.

[5] It is undisputed among the parties that the criminal complaint and search warrant include numerous factual mistakes. For example, the criminal complaint and search warrant reference a black Harley Davidson motorcycle when, in fact, Defendant Dadisman's motorcycle was a red and white Victory motorcycle.

[6] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on February 3, 2022, which is located on the section of the Court's intranet site for FTR recordings.

undercover, unmarked vehicle. [1:08:33-1:08:53]. The two were traveling on Union Road to check on the status of a well-known drug dealer. [1:08:54-1:08:59]. As they were traveling on Union Road, Sheriff Carpenter and Shahan were communicating by telephone; Sheriff Carpenter told Shahan "hey, there's another big player you guys need to start watching." [1:09:00-1:09:07; 1:24:06-1:24:33]. Shahan asked "who?"; Sheriff Carpenter responded, "the guy pulling out of the driveway there on his motorcycle." [1:09:08-1:09:12]. Carpenter said "his name is Dadisman . . . and matter of fact, he's driving around without an endorsement for a motorcycle license . . . I'll go ahead and conduct a traffic stop on him." [1:09:13-1:09:22]. Additionally, the license plate on the motorcycle was registered to a Harley Davidson, not the particular type of motorcycle that it was affixed it. [1:09:23-1:09:35]. Shahan was not sure if Sheriff Carpenter knew the information about the improper license plates at the time. [1:09:36-1:09:40].

Next, the Sheriff turned around and tried to catch up to Dadisman to perform the traffic stop. [1:09:41-1:09:51]. Shahan was unable to get turned around quickly, so Sheriff Carpenter and Dadisman went far ahead of Shahan. [1:09:52-1:10:05]. Shahan was not present for the initial portion of the traffic stop of Dadisman at the gas station; Shahan arrived later, after Sheriff Carpenter had called him and said "hey, you might want to come over here, we've got meth." [1:10:06-1:10:26]. When Shahan arrived, the methamphetamine was already secured in front seat of the Sheriff Carpenter's cruiser. Shahan testified that approximately 2.5 pounds of methamphetamine were recovered based upon measurements later taken at the Barbour County Sheriff's Department. [1:10:27-1:10:38; 1:20:49-1:21:21; 1:21:22-1:22:23].

Shahan swore to the affidavit for a search warrant of Dadisman's residence. [1:10:51-1:11:04; *see* Government's Exhibit No. 2, ECF No. 37-1]. In Paragraph Four of the affidavit, Shahan wrote that Dadisman told the Sheriff Carpenter that he had "a little bit of meth." Shahan

testified he wrote this based on an interview with Sheriff Carpenter where Sheriff Carpenter had told Shahan what had occurred. [1:11:51-1:12:12]. In Paragraph Five, Shahan wrote Dadisman consented to a search of his motorcycle; again, Shahan explained he wrote this based upon what Sheriff Carpenter has relayed to him. [1:12:13-1:12:26].

On cross examination, Shahan testified he also prepared the criminal complaint in this matter. [1:12:35-1:12:51; *see* Government's Exhibit 3, Criminal Complaint, ECF No. 37-2]. Shahan testified he prepared the criminal complaint and search warrant affidavit, despite not being present for the search of Dadisman's motorcycle, because generally, these items and investigations are turned over to the drug taskforce members to handle. [1:12:52-1:13:05]. Shahan testified his only source of information was what Sheriff Carpenter had described to him regarding the events that occurred. [1:13:06-1:13:30]. Shahan testified that when he and Sheriff Carpenter arrived back at the station after the Dadisman traffic stop, Sheriff Carpenter provided a full statement to Shahan regarding the events that occurred. This statement was not recorded in any way. [1:13:31-1:14:19]. Shahan testified he sat in Sheriff Carpenter's office while he typed the criminal complaint and while Carpenter described to him what had transpired. No one else was present for the writing of the complaint and affidavit. [1:14:20-1:15:07]. Shahan testified it is standard procedure that after someone writes a criminal complaint, another officer will read and review to ensure there are no mistakes. [1:15:08-1:15:29].

Shahan testified on cross-examination that in Paragraph 1 of the affidavit, the statement that there was a black Harley Davidson motorcycle is incorrect; the motorcycle was, in fact, a red and white Victory motorcycle. [1:15:30-1:18:45]. Shahan testified the dash cam footage from Sheriff Carpenter's vehicle was not reviewed prior to the drafting of the criminal compliant because there were technical difficulties downloading the dash cam footage. [1:18:46-1:19:14].

Sheriff Carpenter's dash cam did not have audio. [1:19:18-1:19:36]. Sheriff Carpenter was not wearing a body camera. Shahan testified there's no audio recording of the Dadisman traffic stop events to his knowledge. [1:19:37-1:20:01].

Shahan testified that while drafting the criminal complaint, Sheriff Carpenter was standing behind him dictating what should be written. [1:20:02-1:20:28]. Shahan testified the affidavit and criminal complaint essentially mirror one another. [1:20:29-1:20:48]. When questioned about the fact that the criminal complaint written by Shahan reflected that 1.142 pounds of methamphetamine were recovered, Shahan was unable to remember or explain the discrepancy.[7] Shahan testified he has no personal knowledge of any of the factual averments in the Complaint related to the traffic stop; all information therein was based on what Sheriff Carpenter relayed. [1:22:23-1:22:58].

Shahan testified he did not recall Sheriff Carpenter making any statements about officer safety in regard to the need to Terry frisk Dadisman or search for the gun. [1:25:13-1:26:55]. Shahan testified Sheriff Carpenter told him Dadisman gave his consent to search the motorcycle for guns, drugs, anything. [1:22:59-1:23:56]. Shahan testified, according to Carpenter, Dadisman told Carpenter he had a weapon, Dadisman consented to the search, and Carpenter went to retrieve the firearm from the saddlebag. [1:23:57-1:24:06].

Shahan testified that in conversations with Sheriff, he learned that the Sheriff's Department had been taking numerous complaints from citizens on Union Rd. regarding drug trafficking activity happening at the Dadisman's residence. [1:24:34-1:25:12]. Shahan testified that it was his understanding that as part of the routine traffic stop, Sheriff Carpenter asked, "do you mind if I search your bike?"

---

[7] *See supra* n.3.

7

Shahan testified that his criminal complaint does state that Sheriff Carpenter asked the Defendant if he had anything on him, to which the Defendant answered he had "a little bit of meth." Shahan testified this happened right after Sheriff Carpenter asked if he could search the bike. Shahan testified its standard procedure in law enforcement to ask these types of questions. [1:26:56-1:28:49]. Shahan testified it was his understanding was the meth was found on the bike and when Dadisman said he had a little bit of meth, he was referring to having meth on the bike. [1:29:03-1:29:48]. Shahan testified he was uncertain if other deputies could confirm Sheriff Carpenter's statement. Shahan did not interview any other deputies to confirm before drafting his criminal complaint. [1:29:49-1:30:25].

Shahan testified he was not aware a request was made for the K-9 Unit. It was Shahan's understanding that another department overheard the traffic stop on the radio and independently sent the K-9 for a sniff during the traffic stop. [1:30:26-1:30:45]. Shahan testified the Sheriff never requested a K-9; specifically, Sheriff Carpenter told Shahan – "well, I didn't request no canine." [1:30:46-1:32:20]. Shahan testified the K-9 Handler was already on scene when Shahan had arrived, and his sheriff did not request the K-9 Unit because Dadisman has already given consent to get meth out of saddlebag. [1:32:21-1:34:30].

On redirect, Shahan clarified that when he arrived, the methamphetamine had already been found and seized; the canine was already back in a vehicle when Shahan got there. [1:34:31-1:35:42].

### (2) Sheriff Brett M. Carpenter's Testimony

According to the testimony of Sheriff Brett M. Carpenter of the Barbour County Sheriff's Department, on June 29, 2021, he and Deputy Shahan were heading up Union Rd., trying to catch an individual, not Mr. Dadisman, that they thought was dealing methamphetamine on the Mount

Liberty side of Union. [1:38:00-1:38:37]. Shahan was in a separate car behind Carpenter, but the two were communicating via cell phone. [1:38:38-1:38:47]. As Shahan and Carpenter were going up Union Rd. past the property of Dadisman, Carpenter observed Dadisman exiting his property on his motorcycle [1:38:48-1:38:57]. Carpenter told Shahan they had recently received calls that Dadisman was selling methamphetamine. [1:38:58-1:39:03]. Carpenter turned his vehicle around to try to get a traffic stop on Dadisman. [1:39:04-1:39:06]. Dadisman got some distance ahead of Carpenter, and another officer observed Dadisman pull into the Shop and Save parking lot and parked his motorcycle. That officer ran Dadisman's motorcycle information and discovered that license plates and registration came back to a different motorcycle than the ones it was affixed to. [1:39:07-1:39:24; 1:39:36-1:39:43; 1:45:27-1:45:38].

Carpenter parked his car in the parking lot of an abandoned office on South Main Street and waited for Dadisman to come back his way off the bypass. Carpenter soon observed Dadisman driving on South Main Street. Carpenter pulled out of his parking space and began following behind Dadisman. Dadisman turned into Rich Oil, located in Philippi, West Virginia, Carpenter pulled in behind him, initiating his emergency lights [1:39:25-1:39:28; 1:39:44-1:40:09]. Carpenter had a dashboard camera running on his vehicle at this time, but the dashboard camera did not have audio recording that was functioning. [1:40:10-1:41:45; 2:11:30-2:12:03; *see* Government's Exhibit 1, Dashboard Camera].

Sheriff Carpenter and Dadisman engaged in conversation. Dadisman's motorcycle was in front of Carpenter's police cruiser. [1:41:46-1:42:37]. Carpenter asked Dadisman to step backwards towards Carpenter's vehicle so Carpenter could perform a frisk to make sure he didn't have any weapons on his person. [1:42:38-1:42:42]. Dadisman told Carpenter he did not have any weapons on his person. [1:42:43-1:42:50]. Carpenter then, after observing a round of ammunition

9

in the exterior mesh of a saddlebag, asked Dadisman is he had any firearms. [1:42:51-1:43:33]. Dadisman told Carpenter where a firearm is in the saddlebags. Carpenter begins to search, but after having difficulties retrieving the firearm, Dadisman then tells Carpenter "Here, I'll show you where it's at. It's right here." Dadisman proceeds to show Carpenter where the firearm is located. [1:43:34-1:43:50; 1:44:02-1:44:46; 1:58:53-1:59:54]. Carpenter testified he took the firearm for the purposes of safety, placed it into his vehicle, and locked his vehicle. [1:43:51-1:44:01].

Carpenter asked Dadisman if he had any methamphetamine on him, and Dadisman told Carpenter he had "a little bit of meth on him," referring to a small amount of methamphetamine in his motorcycle. [2:02:50-2:03:35; 2:16:30-2:17:04; 2:23:23-2:24:20]. Carpenter asked about the methamphetamine because the Sheriff's Department had received information from various citizens that Dadisman had been selling methamphetamine in Barbour Cunty, West Virginia. [2:03:36-2:03:42]. Dadisman and Carpenter spoke briefly; Dadisman expressed nervous concerns about getting arrested because he was supposed to be visiting his family and granddaughter shortly. Carpenter told Dadisman if he "had a small bag of methamphetamine like that, I'm not hard to work with. We'll get it out; we'll take care of it." Carpenter believed, based on Dadisman's nervous behavior, that Dadisman might be trying to hide something from Carpenter even though Dadisman admitted he had a small bag of methamphetamine. [1:46:24-1:47:58].

Next, Carpenter tried to find a serial number on the firearm to call into the communication center for more information. [1:44:47-1:45:27]. Carpenter testified that due to the improper registration, the motorcycle would need to be towed from the gas station and could not be driven off by the driver, Dadisman. [1:45:38-1:45:54]. Other deputies arrived and can be observed on the dashboard camera footage including Chief Deputy Roy and Patrolman Cody Kuykendall (off-duty) who came in the car of Chief Jeff Walters. [1:45:55-1:46:19; 2:08:10-2:08:14].

Carpenter testified that as he engaged in ongoing conversation with Dadisman about the methamphetamine, a conversation which Chief Deputy Roy was present for. During the conversation, Sheriff Carpenter asked Dadisman if he could perform a search of the motorcycle, and Dadisman consented. [1:48:09-1:48:33; 2:03:43-2:04:20; 2:04:21-2:07:02]. Carpenter did not yet search perform the search because he was waiting for Dadisman to locate exactly where the methamphetamine was. [1:48:34-1:48:39].

Carpenter testified that at some point during the traffic stop, Chief Walters of the Philippi Police Department notified Lieutenant Dustin Cale and asked him to bring a K-9 for a sniff of the vehicle. Carpenter testified he had not requested the K-9. [1:48:40-1:48:58]. Carpenter became aware of the K-9 dispatch and even though he had consent from Dadisman for the search, he decided to wait and have the K-9 perform the sniff test to confirm the location and presence of the drugs. [1:49:53-1:50:06; 2:09:13-2:10:47].

Chief Deputy Roy, Dadisman and Carpenter were all standing near the motorcycle conversing. [1:50:07-1:50:38]. The K-9 with Lt. Dustin Cale of the Philippi Police Department next arrived on scene. [1:48:59-1:49:42; 1:51:40-1:51:48]. The dog walks around the motorcycle and jumped up onto the side of motorcycle. [1:52:00-1:52:24]. The dog leaves after he performs his search. [1:52:25-1:53:06]. Dadisman then walked over to his own motorcycle, reaches into the saddlebag, pulls out a white bag of methamphetamine, and hands it to Sheriff Carpenter. [1:53:07-1:53:28]. Approximately 1.142 pounds of methamphetamine was recovered from the motorcycle, as well as the Rutger .48 special firearm, a box of bullets, a bag of bullets, a cell phone, an SD Card, $1422.08, and a title to a pickup truck. [1:53:30-1:53:47].

On cross-examination, Carpenter testified that when he first encountered Dadisman, he immediately asked him to come back towards the cruiser to separate him from his bike for officer

11

safety reasons. [1:53:48-1:55:54]. Carpenter then performed a <u>Terry</u> frisk or pat down to check for weapons – no weapons were found. Carpenter testified Dadisman was cooperating with him at that time, despite being a little agitated. [1:55:54-1:56:57]. Carpenter testified officer safety was still a concern as Carpenter observed ammunition on the motorcycle. Carpenter expressed concerns about Dadisman returning to his motorcycle. [1:56:58-1:58:15]. Carpenter conceded that Carpenter is younger than Dadisman, Carpenter was armed, and Dadisman was not a prohibited person from owning a firearm or ammunition. [1:58:16-1:58:52]. Carpenter testified the purpose of asking about the firearm, securing it, and locking it up in the vehicle was for officer safety purposes, even where a suspect has been removed from the vehicle. [1:59:55-2:02:30].

On cross examination, Carpenter also testified he has reviewed the criminal complaint prepared by Shahan and believes it is accurate. [2:13:42-2:14:06].[8] Carpenter also testified that Chief Deputy Roy arrived after the <u>Terry</u> frisk of Defendant Dadisman, but before Dadisman provided admitted to having a little bit of methamphetamine and consenting to search the bike. [2:17:30-2:19:02; 2:24:20-2:25:10].

*(3) Lieutenant D.A. Cale's Testimony*

According to the testimony of Lieutenant D.A. Cale of the Philippi Police Department, Lieutenant Cale is a trained K-9 handler with a dog named Raptor. [2:27:00-2:27:14]. Raptor is certified through K-9 Working Dogs International as a patrol dog, a narcotics detection dog, and a tracking dog. [2:27:14-2:27:15].

On June 29, 2021, Lieutenant Cale was in his police cruiser when Chief Walters of the Philippi Police Department requested over the radio for Cale and Raptor to respond to the scene of a traffic stop for an open-air sniff of a vehicle. [2:27:16-2:28:10]. Cale loaded Raptor in the

---

[8] *See* n.3 and n.5 *supra* the veracity of the criminal complaint.

police cruiser and drove to Rich Oil Co. which was less than a quarter of a mile away. [2:28:11-2:28:19].

Once he arrived, Raptor started his test at the front of the motorcycle and worked his way to the rear of the motorcycle. Near the rear fender of the motorcycle, there was a backpack or saddle bag. Raptor began deep breathing on the area of the bag, sat down, and scratched the rear fender of the motorcycle. This is an "alert" for the presence of controlled substances or illegal narcotics. [2:28:32-2:29:11].

On cross examination, Cale testified it was either Chief Walters or Sheriff Carpenter who called for search, but he believes it was Chief Walters who requested the K-9 to be dispatched to Rich Oil. [2:20:20- 2:30:43]. Cale testified Chief Walters was in the parking lot of an abandoned building across from Rich Oil when Cale arrived to the scene. [2:30:44-2:30:59]. The 9-1-1 radio communications related to this call would have recorded.[9] [2:31:25-2:31:52]. Cale testified he was enroute to the scene as of 13:59 and arrived on scene at 14:02. [2:31:53-2:32:14]. The dog alerted on the motorcycle at 14:04. [2:34:06-2:34:33].

Cale testified that when he arrived on the scene, he observed the motorcycle and stuck procedurally to K-9 deployment which first required an observation of the motorcycle's vicinity to see if there were any hazards that might hurt the dog during the sniff. Cale explained he did not recall having any conversations with Sheriff Carpenter or anyone else, other than stating that the K-9 was requested for an open-air sniff of the vehicle. [2:32:37-2:33:02]. Cale did not recall any statements regarding consent. Cale only noticed Dadisman standing beside Sheriff Carpenter. [2:33:03-2:33:45].

---

[9] The 9-1-1 logs of radio traffic were not provided or entered into evidence by the parties for the purposes of this motion hearing; however, the Government did note, on the record, that 9-1-1 logs were provided to Defendant as part of discovery disclosures. [2:33:46-2:34:06].

*(4) Chief Deputy Jeff Roy's Testimony*

According to the testimony of Chief Deputy Jeff Roy, he has been with the Barbour County Sheriff's Department on and off for five years. Roy most recently became Chief Deputy in June 2021. [2:38:00-2:38:36]. On the dashboard camera footage of the June 29, 2021 traffic stop, Roy can be seen standing near Defendant near the gas pump. [2:39:55-2:40:20]. Chief Deputy Roy arrived shortly after Sheriff Carpenter, right as Sheriff Carpenter was Terry-frisking Defendant Dadisman. [2:40:23-2:40:55]. Roy parked his vehicle behind and to the left of Carpenter's vehicle at Rich Oil. [2:45:08-2:45:39]. Roy was first to arrive on the scene after Sheriff Carpenter. [2:58:35-2:58:37; 3:51:00-3:51:27]. Chief Deputy Roy was an on-duty officer, but he was in plain clothes as his uniform had not yet arrived. [2:40:56- 2:41:30]. Roy had previously heard the radio traffic and was aware Sheriff Carpenter was initiating the traffic stop based upon an invalid registration on the bike. [2:41:31-2:42:30].

Roy testified it is not uncommon for backup to respond to traffic stops if other officers are in the area. Specifically, Roy explained that in this case, additional radio traffic came through that identified Dadisman and knowing his history and reputation as a drug user motivated Roy to respond as backup. [2:42:31-2:43:43]. At least four other officers also responded to the scene including Chief Walters of the Philippi City Police. [2:43:44-2:44:39]. When other officers arrived, Roy became aware that there was an ongoing investigation involving Dadisman and his drug-trafficking involvement which had piqued the interest of officers and this particular response. [2:44:40-2:45:08].

After Carpenter performed the Terry frisk of Dadisman behind the motorcycle and beside Sheriff Carpenter's police cruiser, yielding no weapons or drugs on Dadisman's person, Roy stood with Dadisman while Carpenter began to search the bike. Carpenter told Roy that Dadisman gave

14

consent to search because there was a weapon on the bike somewhere. [2:45:09-2:48:34]. Roy testified that any time someone has a firearm, deputies strive to use caution and secure the weapon. [3:01:41-3:04:10]. Roy brought Dadisman farther away from the motorcycle and secured and watched Dadisman while Carpenter performed a search of the motorcycle. Roy never heard Dadisman explicitly consent or deny consent to the search of his motorcycle for the gun. [2:48:35-2:50:30; 2:58:00-2:58:29; 2:59:30-3:00:20]. Roy did hear Dadisman say there was a gun in his backpack, prior to Sheriff Carpenter's locating of the firearm. [2:50:31-2:51:26; 3:06:40-3:06:47]. Roy testified its standard procedure to ask for consent for a search of a vehicle if there's any suspicion that weapons or drugs are present. [2:51:27-2:52:28]. Roy testified there was familiarity of Dadisman among officers and a collective assumption, based upon the knowledge that Dadisman was a drug user, that there may be drugs found on or in the bike. [2:52:29-2:52:47]. There were no discussion or concerns of officer safety, as Dadisman was standing with Roy. Roy did not remember observing ammunition. [2:52:48-2:53:46; 2:53:52-2:54:36]. Carpenter was searching for the firearm, could not find the firearm, Dadisman then walked up to the motorcycle, and with the supervision of deputies, pointed to where the firearm could be located. [2:53:47-2:53:52].

A few minutes after he arrived on scene, Roy heard the request for a K-9 unit to respond to the scene from Chief Walters of the Philippi Police Department [3:00:49-3:01:40].

After the retrieval of the firearm, Roy continued to observe and watch over Defendant Dadisman. [2:54:37-2:55:42]. Dadisman and Carpenter began to converse about the possibly of controlled substances being in the motorcycle. Dadisman indicated that there was a small amount of methamphetamine on the bike. [3:54:39-3:54:54]. Carpenter began asking Dadisman where the methamphetamine was located on the motorcycle. The motorcycle had a number of bags and

backpacks affixed to it. Dadisman was worried because he was getting ready to see his children or grandchildren. [2:56:00-2:56:43; 3:08:41-3:09:33]. Roy stated there were no further conversations of consent to search because consent to search the motorcycle was already given by Dadisman to Sheriff Carpenter. [2:56:44-2:57:59].

Roy was present for the further search of the saddlebags where Dadisman and Carpenter pulled methamphetamine out from the motorcycle. [3:07:50-3:08:41]. Roy did not have a conversation with Sheriff Carpenter to why they waited for K-9 unit to show up when Defendant had already consented to a search. Roy suggested that waiting for the canine search when the canine was already in route could simply be to allow for additional information and to pinpoint the location of the methamphetamine for a more targeted search.  [3:10:17-3:13:40].

On cross examination, Roy testified Sheriff Carpenter handcuffed Dadisman initially then uncuffed him later to allow him to assist in searches. [3:51:28-3:52:23]. Roy testified Dadisman was six-seven feet away from the motorcycle while standing with Chief Deputy Roy. [3:52:24-3:52:51]. The motorcycle was stuffed full with luggage, making searches difficult [3:52:52-3:53:28]. Roy testified it was possible, based on his experience, that the luggage could contain knives, needles, or other items posing a risk to deputies. [3:53:29-3:53:40]. Roy testified that there was already probable cause, based upon Dadisman's admission regarding methamphetamine, and the canine sniff could help locate or pinpoint the methamphetamine among the bags. [3:55:01-3:56:48].

On redirect, Roy testified he did not know of any violent history of Dadisman, and Dadisman was not acting erratically or agitated during the encounter except for he was very nervous about not seeing his family. [3:56:49-3:58:39].

*(5) Defendant Joseph Wayne Dadisman's Testimony*

According to the testimony of Defendant Joseph Wayne Dadisman,[10] on June 29, 2021, after he pulled into the Rich Oil station, he immediately sees the flashing lights of the sheriff's vehicle behind him. Dadisman dismounts his motorcycle, and Sheriff Carpenter approaches. [4:05:23-4:06:53]. Sheriff Carpenter then walked Dadisman back to a position closer to the cruiser, roughly eight to ten feet from the motorcycle. [4:06:53-4:07:17].

Defendant Dadisman testified he never gave consent or permission to Sheriff Carpenter during this encounter to search his motorcycle. [4:07:18-4:07:30]. Defendant Dadisman testified he was never asked for permission or consent to search the motorcycle. [4:07:31-4:07:20].

Dadisman claims he only made the statement "I've got a little bit of meth." after the canine was brought in for a sniff of the vehicle and the canine alerted on the vehicle indicating the presence of controlled substances. [4:07:21-4:08:28]. Roy arrived just moments after Sheriff Carpenter initiated the traffic stop, when Dadisman was being frisked by Carpenter. Dadisman testified he stood next to and spoke with Chief Deputy Roy for the remainder of the encounter. [4:08:28-4:09:50].

Deputies told Dadisman "if you have any drugs on you, let us know, we can work with you." [4:09:51-4:10:07; 12:13:26-4:14:19]. Dadisman responded "I'm just trying to see my granddaughter, my family is in from Ohio, and I'm just trying to see them." [4:10:08-4:10:16]. Dadisman did not tell officers about the methamphetamine until after the canine alert. [4:10:17-4:10:27]. Dadisman later reached in and grabbed the methamphetamine from his motorcycle for officers. [4:10:28-4:10:40].

---

[10] Defendant conferred with counsel prior to testifying and was also advised by the Court of his constitutional rights, including his right to remain silent. [4:03:30-4:05:011].

On cross-examination, Dadisman testified he was a methamphetamine user, but he was not high on methamphetamine on the date in question. [4:10:45-4:11:00]. Dadisman testified he was using methamphetamine once every couple days. [4:11:01-4:11:08]. Dadisman testified he was agitated because he was being detained and he was already late in meeting up with his daughter and granddaughter. [4:11:09-4:11:36]. Dadisman admitted he knew there was methamphetamine in his motorcycle. [4:11:37-4:11:44].

Dadisman testified he never consented to a search, but he told deputies that there was a firearm in the motorcycle and said he would retrieve gun for them. [4:11:45-4:12:10]. Sheriff Carpenter asked Dadisman if he had any drugs, to which Dadisman initially responded no. [4:12:11-4:12:34]. Dadisman only admitted to having a little bit of meth on him after the canine had alerted on the car. [4:12:35-4:12:46]. The methamphetamine was retrieved not long after. [4:12:47-4:13:00]. Dadisman recognized in his testimony that the methamphetamine was, in fact, a large quantity. [12:13:01-12:13:22]. Dadisman testified he was not handcuffed until after the methamphetamine was retrieved. [12:13:23-12:13:26]. Dadisman admitted he had improper license plates on his motorcycle. [4:14:19-4:14:46].

### III. LEGAL ISSUES AND ANALYSIS

Defendant contends, in his motion, that (1) The traffic stop was unlawful because it lacked reasonable suspicion and was entirely pretextual, and (2) because the traffic stop is invalid, the subsequent search warrant is invalid.

During the motion hearing, defense counsel additionally argued that no sincere officer safety concerns motivated or justified any search during the motorcycle traffic stop. [4:16:41-4:17:15]. Defense counsel additionally argued that there is not consistent circumstantial or direct evidence or testimony supporting that Defendant Dadisman consented to the search or admitted to

possessing methamphetamine prior to a search. [4:17:15-4:19:18]. Defense counsel argued there was no reasonable suspicion to justify the request and deployment of a K-9 unit for an open-air sniff of the vehicle. [4:19:19-4:20:49]. Defense counsel conceded that six or seven minutes is not an inordinate amount of time to wait for a dog sniff and conceded that there is no dispute that Defendant's motorcycle had improper plates. [4:20:49-4:22:45]. Defense counsel argued the proper procedure should have been the immediate impound of the motorcycle and application for a search warrant. [4:22:45-4:23:37].

In his supplemental brief, Defendant emphasizes the arguments previously provided challenging that the improper registration was insufficient to justify an investigative or traffic stop, that no real officer safety concerns existed to justify a search of the motorcycle, and that any delay created so the K-9 may perform a sniff is impermissible and unconstitutional. [ECF No. 42].

On the contrary, the Government argues that the traffic stop was justifiable as there was a legitimate traffic violation – Dadisman's motorcycle had improper registration as the license plate from another vehicle was on the motorcycle. The Government further argues first search of Defendant Dadisman's bag was a limited search for Defendant's firearm and was permissible under Terry v. Ohio, 392 U.S. 1 (1968) because the officers had intel Dadisman had been selling methamphetamine and Dadisman told officers he had a gun. [ECF No. 29 at 3]. The Government also argues that the six and a half (6.5) minute detention of Dadisman while deputies waiting for the canine to arrive was constitutionally permissible, especially where the motorcycle had an improper license plate and could not be freely driven away. [Id.]. The Government contends the second search of the motorcycle which lead to the retrieval of the methamphetamine from a second saddlebag was supported and based upon probable cause from the K-9 alert. [Id. (citing United States v. Palmer, 820 F.3d 640 (4th Cir. 2016)].

In oral arguments at the motion hearing, the Government, by Assistant United States Attorney Warner, argued that the K-9 alert on the motorcycle, as captured on the dashboard camera footage, provides a constitutional basis to search regardless of whether or not Defendant provided consent to search the vehicle. [4:15:11-4:15:37; 4:16:16-4:16:35]. Additionally, the Government noted that Defendant's admissions regarding the presence of methamphetamine also added to probable cause to search the motorcycle. [4:15:38-4:16:15].

In the supplemental brief filed, [ECF No. 40], the Government notes that two traffic violations, a license plate assigned to another vehicle being on the motorcycle and the lack of a motorcycle endorsement on Defendant Dadisman's drivers license, justified the traffic stop and ultimately lead to the seizure and towing of the motorcycle. Additionally, the Government argues the length of detention before the arrival of the trained narcotics dog was permissible, especially where the Sheriff intended to seize and tow the motorcycle regardless and where the stop did not take longer based upon the wait for the dog. [ECF No. 40 at 3-4]. Ultimately, the Government argues the dog's "alert" justified the warrantless search which yielded methamphetamine in this case. [Id.]

### A. Legal Principles

As a foundational matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "cardinal principle" is "that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357

(1967)). It is generally the Government's burden to demonstrate that one of these exceptions applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971).

Also well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### B. Analysis

The issues here require the following sequential analysis: (1) whether the traffic stop of Dadisman was constitutionally permissible; (2) whether the first search of Dadisman's motorcycle for a firearm was justified as a limited, reasonable protective search; (3) whether Dadisman's detention pending a canine sniff was permissible and whether the second search of the motorcycle (yielding methamphetamine) is supported by probable cause; and (4) whether the subsequent search warrant is invalid as fruit of the poisonous tree.

### *(1) Traffic Stop*

A traffic stop of an automobile is reasonable if law enforcement officers have probable cause that there has been a traffic violation. Whren v. United States, 517 U.S. 806, 810 (1996). Even pretextual stops for minor traffic violations are constitutionally permissible if the officer has an objective right to stop the vehicle, irrespective of the officer's subjective motivations or suspicions; the subsequent seizure of evidence of a more serious offense will not be suppressed on the grounds that the stop was pretextual. *Accord* Ohio v. Robinette, 519 U.S. 33, 35 (1996); Whren v. United States, 517 U.S. 806 (1996); *and* United States v. McDonald, 61 F. 3d 248,252 (4th Cir. 1995).

Furthermore, an officer who imposes a detention for investigatory purposes "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3f 328, 335 (4th Cir. 2008), (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)), *cert. denied*, 555 U.S. 1118 (2009); Whren, 517 U.S. at 810; and United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2005). An officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation, but any further detention for questioning is beyond the scope of a Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." United States v. Brugal, 209 F.3d 353, 358 (4th Cir. 2000) (en banc) (quoting United States v. Rusher, 966 F. 2d 868, 876-77 (4th Cir. 1992). *Accord* United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017)(checking identification of driver, vehicle registration, databases, calling for a K-9 Unit sniff for drugs and posing unrelated questions was permissible where it did not prolong stop for more than two minutes) and United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011)(asking drug-related questions during traffic stop permissible, but absent reasonable suspicion or diligence in pursuing purpose of stop fifteen-minute stop violated Fourth Amendment).

Here, Dadisman's vehicle had a license plate from another vehicle upon it – this is improper use of registration plate under West Virginia Code Section 17A-9-3.[11] Even if officers had the

---

[11] *See* W. VA. CODE § 17A-9-3 ("No person shall lend to another any certificate of title, registration card, registration plate, special plate or permit issued to him if the person desiring to borrow the same would not be entitled to the use thereof, nor shall any person knowingly permit the use of any of the same by one not entitled thereto, nor shall any person display upon a vehicle any registration card, registration plates or permit not issued for such vehicle or not otherwise lawfully used thereon under this Traffic Code.").

subjective motivation of furthering their drug investigation against Defendant Dadisman, the traffic stop initiated by law enforcement officers upon Dadisman and his motorcycle was constitutionally permissible where there was an objective right to stop the vehicle for the improper use and display of a license plate. Additionally, the temporary detention and questioning of less than ten minutes associated with the traffic stop was justifiable in order for officers "to perform the traditional incidents of a routine traffic stop." Brugal, 209 F.3d at 358.

### (2) First Search of Motorcycle – Firearm

If reasonable suspicion to stop a suspect exists – and the officer reasonably believes the defendant may be armed and dangerous – the officer is entitled to frisk the Defendant and perform a limited search for weapons. See e.g., Terry v. Ohio, 393 U.S. 1, 16 (1968); United States v. Hensley, 469 U.S. 221, 226-28 (1985); United States v. George, 732 F. 3d 296, 299-302 (4th Cir. 2013) (approving frisk of passenger in vehicle based on reasonable suspicion that he was armed and dangerous), cert. denied, 572 U.S. 1009 (2014); and United States v. Elston, 479 F.3d 314, 319 (4th Cir. 2007) (approving search of vehicle for weapon and ammunition during investigative stop).

Courts, in determining the reasonableness of these searches, must balance "the public interest and the individual's right to personal security free from arbitrary interference by law officers." Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)).

The Supreme Court has specifically extended Terry and held that officers conducting an traffic stop may carry out a protective search of the suspect's vehicle if they have a reasonable belief that the suspect is dangerous and may gain control of weapons inside the vehicle. Michigan v. Long, 463 U.S. 1032 (1983). See also United States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007)

(search of truck was a protective search where suspect poses a risk and may later be able to retrieve the weapon). It is of no legal consequence whether the individual is lawfully permitted to carry the firearm. United States v. Robinson, 846 F.3d 694, 696 (4th Cir.) (en banc) (reasonable suspicion that an individual who had been lawfully stopped is armed is sufficient to justify frisk, that is, no further evidence of "dangerousness" is required), *cert. denied*, 13 S. Ct. 379 (2017).

In the instant case, Dadisman disclosed to officers that he had a firearm in his motorcycle. Even after he was moved six to ten feet away from his motorcycle, an unsecured firearm within lunging distance of a suspect poses a risk that it may be retrieved and used against officers. Accordingly, officers were justified in performing a limited protective search of Dadisman's motorcycle to gain control of the weapon and secure the risk posed to officers.

### (3) K-9 Sniff and Second Search of the Motorcycle

A drug dog's sniff of a vehicle does not require a warrant because it is not a "search" for purposes of the Fourth Amendment. Illinois v. Caballes, 543 U.S. 405, 409 (2005). The use of dog sniffs as an investigative tool is "*sui generis*" or unique under the Fourth Amendment. Id. at 408–09. When a trained narcotics dog "alerts" to the presence of drugs, this fact alone constitutes "probable cause" to search the vehicle to which the dog alerted. *See e.g.* Illinois v. Caballes, 543 U.S. 405, 409-410 (2005); United States v. Palmer, 820 F.3d 640, 650 (4th Cir. 2016); and United States v. Jeffus, 22 F.3d 554, 556-557 (4th Cir. 1994) (use of drug dog not itself a "search," but fact that drug dog "alerts" constitutes probable cause to search).

Law enforcement officers may detain a vehicle while awaiting a drug dog's arrival and sniff, but the detention must be reasonable, with officers using "diligence in pursuing their investigation" and minimizing intrusion upon the suspect. United States v. McBride, 676 F.3d 385, 395 (4th Cir. 2012) (fifty-five-minute detention of vehicle in parking lot while awaiting arrival of

drug dog was not unreasonable as officers were diligent in their active investigation). *See also* United States v. White, 42 F.3d 457, 460 (8th Cir.1994) (eighty-minute wait for canine narcotics unit was reasonable); United States v. Yang, 345 F.3d 650, 653–54 (8th Cir.2003) (allowing for a more extended detention once defendant was allowed to drive to a more secure location). *But see* United States v. Place, 462 U.S. 696, 710, 103 S. Ct. 2637, 2646, 77 L. Ed. 2d 110 (1983) (ninety-minute detention of passenger and luggage unreasonable seizure).

Here, Defendant was detained for approximately ten minutes while law enforcement waited for the K-9 handler to arrive. The request for a K-9 happened immediately when news of the traffic stop was broadcast. The parties agree that the motorcycle had improper license plates and, thus, could not be driven away by Defendant Dadisman; the motorcycle was to be towed away to an impound lot by the Barbour County Sheriff's Department. It is contested whether Dadisman provided consent to search his motorcycle and when Dadisman admitted to possessing "a little bit of meth." Regardless of the other factual disputes, the fact that Raptor, a trained narcotics drug, alerted to the presence of drugs on the motorcycle alone provides probable cause for deputies to search the vehicle for controlled substances. While the footage shows that it was Dadisman who ultimately retrieved the methamphetamine from the motorcycle and hands it to the surrounding deputies, the deputies' search and seizure of motorcycle for controlled substances is wholly supported by K-9 Raptor's alert. The undersigned finds the second search of the motorcycle for methamphetamine is permissible under the Fourth Amendment because the K-9 alert provided probable cause.

*(4) Subsequent Search Warrant*

"Ordinarily, when a search violates the Fourth Amendment, the fruits thereof are inadmissible under the exclusionary rule, 'a judicially created remedy designed to safeguard

Fourth Amendment rights generally through its deterrent effect.'" United States v. Doyle, 650 F.3d 460, 466–67 (4th Cir. 2011) (citing United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) and Mapp v. Ohio, 367 U.S. 643, 654–55, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (holding that the Fourth Amendment, and particularly the exclusionary rule, is applicable to states through the Fourteenth Amendment)). "However, this deterrence objective is not achieved through the suppression of evidence obtained by an officer acting with objective good faith within the scope of a search warrant issued by a magistrate." Doyle, 650 F.3d at 467 (citing United States v. Perez, 393 F.3d 457, 461 (4th Cir.2004) (quoting Leon, 468 U.S. at 920, 104 S.Ct. 3405))(internal quotations omitted).

Here, Defendant Dadisman moves to suppress the evidence seized during the June 29, 2021 traffic stop and any and all "fruits" yielded from the Dadisman residence. As previously stated, the undersigned finds that all searches and investigatory measures related to the traffic stop are constitutionally permissible, including the Terry frisk for officer safety, the limited search to secure the firearm during the traffic stop, the K-9 sniff, and the final search for methamphetamine. Finding no Fourth Amendment violations, the undersigned finds no reason to invalidate the search warrant or suppress evidence or information related thereto.

## IV. CONCLUSION

For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress, [ECF No. 26], be **DENIED**.

Any party may, **on or before February 14, 2022,**[12] file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to**

---

[12] Although parties usually have 14 days to respond to a Report and Recommendation such as this, that is a maximum time to respond, not a minimum. In this matter, the pretrial conference is scheduled for February 16, 2022, and the jury selection and trial for March 8, 2022.

**which objection is made, and the basis of such objection.**  A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted February 9, 2022.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE